IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IVONNE M. R. G., | § | |
| Plaintiff, | § | |
| | § | |
| | § | Civil Action No. 3:17-CV-1199-D |
| | § | |
| NANCY A. BERRYHILL, ACTING | § | |
| COMMISSIONER OF SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| Defendant. | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**

By *Standing Order of Reference*, filed July 17, 2017 (doc. 15), this action has been referred for determination of non-dispositive motions and issuance of findings, conclusions and recommendation on dispositive motions. Before the Court are *Plaintiff's Motion for Summary Judgment*, filed August 5, 2017 (doc. 17), and *Defendant's Motion for Summary Judgment*, filed August 29, 2017 (doc. 19). Based on the relevant filings, evidence, and applicable law, the plaintiff's motion should be **GRANTED IN PART**, the defendant's motion should be **DENIED IN PART**, the Commissioner's decision should be **REVERSED IN PART,** and the case should be **REMANDED** for further proceedings.

## I. BACKGROUND[1]

Ivonne M. R. G. (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying her claims for a period of disability and disability insurance benefits (DIB) under Title II of the Social Security Act (Act), and for supplemental security income (SSI) under Title XVI of the Act. (*See* docs. 1; 17.)

---

[1] The background information comes from the transcript of the administrative proceedings, which is designated as "R."

A.    **Procedural History**

 On September 25, 2013, Plaintiff filed her applications for a period of disability, DIB, and SSI, alleging disability beginning on November 24, 2009.  (R. at 221-22, 231-32, 260.)  She subsequently amended her applications to allege disability beginning on June 28, 2011.  (R. at 149, 260.)  Her claims were denied initially on January 15, 2014, and upon reconsideration on April 17, 2014.  (R. at 260, 278, 282, 295-98.)  On April 30, 2014, Plaintiff requested a hearing before an Administrative Law Judge (ALJ).  (R. at 299.)  She appeared and testified at a hearing on November 30, 2015.  (R. at 144-91, 260.)  On April 19, 2016, the ALJ issued a decision finding her not disabled and denying her claim for benefits.  (R. at 260-270.)

Plaintiff timely appealed the ALJ's decision to the Appeals Council on April 20, 2016.  (R. at 9-10.)  The Appeals Council denied her request for review on March 10, 2017, making the ALJ's decision the final decision of the Commissioner.  (R. at 1-4.)  Plaintiff timely appealed the Commissioner's decision under 42 U.S.C. § 405(g).  (*See* doc. 1.)

B.    **Factual History**

1.    **Age, Education, and Work Experience**

Plaintiff was born on October 22, 1967, and was 48 years old at the time of the hearing.  (R. at 151, 269.)  She had at least a high school education and could communicate in English.  (R. at 269.)  She had past relevant work as an office clerk.  (*Id*.)

2.    **Medical Evidence**

On January 10, 2012 Plaintiff visited the Department of Psychiatry in the Tarrant County Hospital District (TCHD).  (R. at 508-12.)  She reported back pain at a level 7 on the pain scale, and complained of continued anxiety, agitation, and depression.  (R. at 508, 510.)  She was neat,

2

unimpaired, cooperative, alert, oriented to person and place, goal directed, well organized, and had

good articulation, insight, and judgment.  (R. at 510.)  Her memory recall and associations were

intact, and she denied having hallucinations, delusions, aggression, or suicidal ideation.  (*Id.*)  She

had a follow-up assessment at the TCHD on April 3, 2012.  (R. at 504-07.)  She reported no pain,

and had full affect and a euthymic mood, was alert and oriented to person, place, time, and situation,

and had fair concentration.  (R. at 504, 506.)  She showed continued depression and was not taking

her medications consistently.  (R. at 507.)

On January 18, 2012, Plaintiff visited the orthopedic sports medicine clinic at the TCHD for

an evaluation of her lower back pain.  (R. at 611.)  She stated that she had back pain for about 10

years that came on gradually.  (*Id.*)  She denied having any one incident or trauma, but stated that

she had a combination of several incidents at work that may or may not have contributed to her back

pain.  (*Id.*)  She described her pain as burning, tingling, and shooting, and scaled her pain as 7 out

of 10.  (*Id.*)  At its best, her pain was at a 3 out of 10 on the pain scale, but it could escalate up to a

9 or 10.  (*Id.*)  She had some radicular symptoms down her legs bilaterally, and would get a sharp

lancing electric pain that could go to the arch of her foot or middle toes.  (*Id.*)  She denied any

weakness, sensory loss, loss of bladder or bowel function, or saddle anesthesia, and stated that she

had not fallen.  (*Id.*)  Nothing made the pain better, and it worsened with sitting, standing, walking,

or any sort of activity.  (*Id.*)  She was unable to stand up straight when she awakened in the morning,

felt better when she was on a shopping cart, and had not had any dedicated physical therapy.  (*Id.*)

She was alert, oriented, and in no apparent distress.  (R. at 612.)  A back exam showed that she was

non-tender over the spinous processes or lumbar facets, positive for paraspinal muscle spasms, and

had no paraspinal muscle hypertrophy.  (*Id.*)  She had relatively normal flexion, extension, rotation,

and side bending.  (*Id*.)  She was tender over the bilateral sacroiliac joints, and tender to palpation

of her bilateral greater trochanteric bursae.  (*Id*.)  Her straight leg raises were subjectively positive

bilaterally and greater on the left than the right, and Faber's test[2] was positive and greater on the left

than the right.  (*Id*.)  An x-ray conducted the same day showed degenerative narrowing of disc space

at L4-L5 that was worse on the left than the right, mild narrowing of the lumbosacral interspace, no

evidence of a lumbar spine fracture, intact neural arches, and no subluxations.  (R. at 614, 710.)

An MRI of Plaintiff's lumbar spine conducted on February 11, 2012, showed changes to L4-

L5 and L5-S1, multilevel degeneration of the lumbar spine most significantly at L4-L5 and L5-S1,

without spinal canal stenosis, and mild to moderate narrowing of neural foramen at L4-L5 and L5-

S1.  (R. at 595, 701.)  It was noted that annular fissuring at L4-L5 and L5-S1 could have also been

causing Plaintiff's pain.  (*Id*.)

Plaintiff saw Chad R. Vickers, A.P.R.N., at the John Peter Smith Hospital's (JPS) outpatient

behavioral health clinic several times from June 12, 2012, to February 19, 2013.  (R. at 532-33, 539-

40, 561-62, 568-69.)  On June 12, 2012, she reported that she stopped taking Abilify because it made

her increasingly sleepy, but that she had continued to take Cymbalta, Klonopin, and Ambien.  (R.

at 532.)  She also reported that she was managing fairly okay and getting things done even though

she had to force herself to do them at times.  (*Id*.)  She was better with Cymbalta than without, was

not crying all the time like before, and she did not want to change any of her medications.  (*Id*.)  She

showed continued mood symptoms, but was stable on her current regimen, and no changes were

recommended to her treatment.  (R. at 533-34.)  Her condition was partially improved, she was

---

[2] "The "(Patrick's) FABER Test" is used to identify the presence of hip pathology by attempting to reproduce pain in the hip, lumbar spine, and sacroiliac region.  It is a passive screening tool for musculoskeletal pathologies in the middle region of the human body, like hip, lumbar, or SI joint dysfunction, or an iliopoas spasm."  *O'Hara v. Colvin*, No. 4:14-CV-03626, 2016 WL 4938004, at *13 n.36 (S.D. Tex. Mar. 15, 2016) (citation omitted).

active and future oriented, and she showed minimal residual psychiatric symptoms from her prior presentation.  (R. at 532.)  At her next appointment on September 20, 2012, she reported that her mood had been was good since the previous appointment, and she felt happier and was not crying. (R. at 539.)  She complained of having panic attacks three times daily; she would get a sense of impending doom and her chest would start pounding.  (*Id*.)  Klonopin was not effective, and she requested something different, but Ambien was effective and helped her sleep better.  (*Id*.)  On December 13, 2012, she reported doing better and stated that her anxiety had improved some on Vistaril.  (R. at 561.)  On February 19, 2013, Nurse Vickers noted that Plaintiff was confused regarding the dosage of her medication.  (R. at 568.)  Plaintiff reported that she had started seeing a psychotherapist at the Texas Department of Assistance and Rehabilitative Services (DARS).  (*Id*.) Her mental status exams at these appointments consistently showed that she was neat, cooperative, alert, oriented to person, place, time, and situation, and had good eye contact, good judgment, full mood and affect, intact memory, a normal level of activity, and an unimpaired gait.  (R. at 532-33, 539-40, 561-62, 568-69.)  She also consistently exhibited a goal directed and logical thought process, denied having hallucinations or delusions, and was not a suicidal or aggression risk.  (R. at 533, 539-40, 561-62, 568-69.)  Her articulation fluctuated between good, fair, and poor.  (R. at 532, 540, 562, 569.)  Her Global Assessment of Functioning (GAF) score consistently fell between 60 and 63.  (R. at 533, 540, 563, 569.)

On October 31, 2012, Plaintiff met with Henah Chaudhry, D.O.  (R. at 546.)  She reported low back pain and stated that she went to physical therapy but with no relief.  (*Id*.)  She requested spinal injections.  (*Id*.)  Dr. Chaudhry noted that Plaintiff had an MRI within the previous year, and was found to have gastritis that was treated with Nexium.  (*Id*.)  Dr. Chaudhry also noted that she

had not had her thyroid checked in months and had gained weight, and her lipids had been slightly elevated in the past. (*Id*.) Plaintiff was well-developed and well-nourished, and showed no distress. (*Id*.) She exhibited decreased range of motion and tenderness in her lumbar back. (R. at 547.)

On November 28, 2012, Plaintiff saw Azhar Afaq, M.D., for a follow-up appointment. (R. at 551.) He noted that Plaintiff's past medical history included depression, hypothyroid, gastric ulcer, gastroesophageal reflux disease (GERD), back pain, right foot pain, and thyroid cancer, and she had also been overweight. (*Id*.) At the time of the appointment, she had gained weight, felt fair, and reported anxiety and depression. (*Id*.)

On December 20, 2012, Plaintiff went to JPS complaining of back pain. (R. at 913.) She stated that her back pain came on gradually, and she had it for about 10 years. (*Id*.) She described her back pain as constant, burning, tingling, and shooting. (*Id*.) Her pain was at a 3 out of 10 on the pain scale, but it could get as high as 10 out of 10. (*Id*.) Pain occasionally radiated down her right leg diffusely, and most movements exacerbated the pain. (*Id*.) Laying down or sitting provided some relief, and she denied weakness, sensory loss, loss of bladder or bowel function, or saddle anesthesia. (*Id*.) Her mood, affect, behavior, thought content, and vital signs were normal, and she was oriented to person, place, and time. (R. at 915.) A plan was created for Plaintiff to have facet injections in her back, and to place her on medication for pain relief and refer her to physical therapy for core strengthening and correction of muscle imbalance. (R. at 916.)

On January 15, 2013, Plaintiff underwent a left therapeutic lumbar facet injection at the L4-L5 and L5-S1 levels to treat her lumbar spondylosis. (R. at 924.) She tolerated the procedure well, there were no complications, and she was discharged after observation. (*Id*.) She had 100% pain improvement, no motor changes, and positive sensory changes at the time of discharge. (*Id*.)

On January 22, 2013, Plaintiff went to JPS and saw Nicholas Defauw, D.O.. (R. at 934.) She presented with lower back pain for right side facet joint injections. (*Id*.) She previously had 100% pain relief with the left side injection, and because she did not have pain that day, there was no indication for a right side injection. (*Id*.) Her pain was axial and did not radiate. (*Id*.)

On February 12, 2013, Plaintiff received medial branch nerve blocks on her left side at L-3, L-4, L-5, and DRL-5 to treat her lumbar spondylosis and lower back pain. (R. at 940.) The procedure went well despite some increased discomfort due to the length of the procedures. (*Id*.) There were no complications, and she was discharged with 100% pain improvement and no motor or sensory changes at the time of discharge. (*Id*.)

On March 4, 2013, Plaintiff saw Dr. Chaudhry again. (R. at 575.) Dr. Chaudry noted that Plaintiff was receiving treatment for her back pain. (*Id*.) She was well-developed, well-nourished, in no distress, and had normal range of motion in her neck. (*Id*.)

On March 5, 2013, Plaintiff visited Paul L. Warren, Psy. D., for psychological testing upon referral from DARS. (R. at 498.) Dr. Warren observed that she was casually dressed, well groomed, tall, and mildly obese. (R. at 499.) She was rested, generally attentive, open, and cooperative throughout the psychological evaluation. (*Id*.) Her gross and fine motor skills appeared to be normally developed and unimpaired; her posture and gait were normal; she did not appear to be in any apparent distress or pain; she maintained normal eye contact and demonstrated well-developed interpersonal skills and positive relatedness; her mood was mildly dysphoric and anxious; her affect was appropriate; her thought process was goal-directed and logical; and there was no evidence of any thought or perceptual disorder. (*Id*.) The results of her present intelligence testing indicated that Plaintiff was within the borderline range of intellectual functioning with an IQ of 83. (*Id*.) She

demonstrated a significant impairment in her attention-concentration for auditory stimuli, with a working memory index score of 69, and her attention-concentration was intact for visual stimuli, with a processing speed index score of 92. (*Id*.) Her spatial motor skills were well below average; her fluid visual reasoning abilities were within the average range; her overall fund of knowledge was within the average range; and her command of the English language was within the low average range. (*Id*.) She was cognitively concrete and demonstrated adequate frustration tolerance on challenging problems. (R. at 499-500.) Plaintiff tested in the 13th percentile for word reading, 34th percentile for spelling, and 10th percentile for math computation. (R. at 500.) Dr. Warren noted that her real IQ was likely 5-10 points higher, but was adversely affected by problems with attention concentration. (*Id*.) Dr. Warren found that the results of Plaintiff's present personality testing were consistent with her history of depression and chronic pain. (*Id*.) He opined that she experienced significant symptoms of thought disorder, which was likely attributable to both depression and an attention deficit disorder. (*Id*.) Dr. Warren's diagnostic impressions indicated major depression in partial remission, attention deficit hyperactivity disorder (ADHD) of the primarily inattentive type on Axis I; borderline intellectual functioning on Axis II; and lumbar spondylosis, radiculopathy, neuropathy, and Guyon syndrome at Axis III. (R. at 501.) He noted that her vocational limitations included her significant impairment in attention-concentration for auditory stimuli as well as her history of chronic pain, depression, and anxiety. (*Id*.) He also noted that she was amenable to assistance and appeared to desire positive change in her life. (R. at 500.)

At a follow-up appointment with Dr. Defauw on March 11, 2013, Plaintiff reported that injections relieved her back pain on both the right and left side for one day, and she had 80% improvement with the nerve blocks that lasted about one week. (R. at 950.) She could move in bed

with less pain, and noted that the pain was a more electric sensation than it was before. (*Id*.) She was active, alert, cooperative, oriented to person, place, and time, well-developed, well-nourished, in no distress, and she had normal mood, affect, behavior, judgment, and thought content. (*Id*.)

On March 12, 2013, upon referral from DARS, Gerry Nichols, O.T.R., completed a functional capacity evaluation for Plaintiff. (R. at 393-94.) Plaintiff was able to complete all tests, and demonstrated consistent effort on all tests. (R. at 394.) Mr. Nichols opined that Plaintiff qualified to lift safely at the sedentary level, which allowed for occasional lifting of up to 10 pounds and frequent lifting of negligible weight. (*Id*.) She demonstrated a range of motion deficit in her lumbar spine, and her chief complaints were panic attacks that occurred about three times per day and low back pain. (*Id*.) Mr. Nichols next opined that Plaintiff demonstrated valid effort in 13 out of 19 measurements, suggesting that she was severely inhibited by her symptoms. (*Id*.) He further opined that based on the assessments, her limiting factors included: decreased lifting capacity, decreased work capacity, decreased functional mobility, poor dynamic balance, poor safety, decreased activity tolerance, and poor symptom management. (R. at 394.) He recommended that Plaintiff could lift at the sedentary level and only up to her waist; occasionally bend, stoop, twist, push, pull, and kneel; stand occasionally and only for 10-15 minutes at a time; and walk occasionally and only for a maximum of 5-10 minutes or 300 feet at a time. (*Id*.) Plaintiff did not demonstrate the ability to safely squat, crouch, or climb during the evaluation. (*Id*.) He also recommended that Plaintiff could work only 4-6 hours per workday. (R. at 411.)

On April 1, 2013, Plaintiff underwent medial branch radiofrequency denervation on the left sides of L2, L3, L4, and L5 to treat lumbago and lumbar spondylosis. (R. at 752.) She tolerated the procedure well, there were no complications, and she was taken to recovery in good condition. (R.

at 752-53.)  The procedure was successful, and she was discharged.  (R. at 753.)

On April 16, 2013, Plaintiff met with Nurse Vickers again and provided him with her test results from Dr. Warren, which indicated diagnoses of major depression and ADHD.  (R. at 580.) Nurse Vickers discussed with her at length about her ADHD symptoms, and Plaintiff stated that she would start numerous things but would get overwhelmed and would not finish.  (*Id.*)  She had difficulty making plans and doing things, was easily distracted, and was interested in ADHD treatment.  (*Id.*)  Nurse Vickers noted that Plaintiff's condition was partially improved, and she was improving.  (R. at 580-81.)  She was continued with Cymbalta and Ambien as prescribed, and she was prescribed Provigil for ADHD.  (R. at 582.)  She had another appointment with Nurse Vickers on May 28, 2013, and reported being about the same since her last appointment.  (R. at 587.)  She stated that on Provigil, she felt less fogginess in her mind, more organized, and like she was completing tasks more often, but did not feel as noticeable of a change as she had hoped.  (*Id.*)  She denied any adverse affects from the medication and was open to adjustment.  (*Id.*)  She also reported that DARS told her she was unemployable.  (*Id.*)  Nurse Vickers increased her Provigil dosage.  (R. at 589.)  At both appointments, she was cooperative, alert, oriented to person, place, time, and situation, and had good concentration, intact memory, and a goal directed and logical thought process.  (R. at 580-81, 587-88.)

On May 13, 2013, Plaintiff underwent a three-day vocational evaluation at Goodwill Evaluation Services (Goodwill).  (R. at 413.)  On the General Aptitude Test Battery (GATB), Plaintiff had a general learning ability in the 8th percentile, which was below average.  (R. at 420.) On the Purdue Pegboard Test, which is a measure of fine finger dexterity, Plaintiff scored in the 4th percentile on her right hand and 5th percentile on her left hand, both of which were well below

10

average.  (R. at 421.)  Plaintiff's scores were compared with the minimum scores indicated for success in 66 worker trait groups or aptitude programs, and the minimum scores were not met for any occupational aptitude patterns at the high level of confidence.  (R. at 420.)  She was found to have physical limitations due to her back, neck, shoulder, and hand conditions, and it was recommended that she be limited from: lifting more than 10 pounds with no lifting above the waist; continuously bending at the back; climbing more than three steps; walking more than 5-10 minutes; standing more than 10-15 minutes; constantly sitting; frequently kneeling; and any squatting.  (R. at 425.)  Her vocational limitations also included depression and anxiety, which limited emotional coping, and the evaluator opined that her limited emotional coping could add to the challenge of performing a typical sedentary job.  (R. at 425, 427.)  She also had difficulty performing repetitive hand motions and frequently needed to change positions, which the evaluator opined could also complicate her working sedentary jobs.  (R. at 425.)  The evaluator noted that Plaintiff had questionable hand tolerance because of carpal tunnel syndrome and neuropathy.  (R. at 427.)  Additionally, she was found to have an inconsistent memory, and the evaluator further opined that she had inconsistent attention to auditory stimuli, which would make it difficult for her to consistently function as a translator.  (R. at 425.)

On May 29, 2013, Plaintiff had another follow-up with Dr. Defauw in relation to the April 1, 2013 spinal procedure.  (R. at 957.)  She stated that it was significantly unpleasant for the first 2-3 days because of significant increased pain, but after the initial increase, her pain level dropped significantly, and she felt much improved.  (*Id*.)  She noted that pain on her right side was worse with standing and better with laying down in certain positions.  (*Id*.)  She also remembered that she wore a back brace when she was younger because her back was crooked and her muscles were

underdeveloped on one side.  (*Id.*)  Dr. Defauw found that she had weakness and improper firing patterns of her gluteal musculature, with significant gluteal weakness on the left as compared to the right.  (*Id.*)  He assessed her as having back pain and lumbosacral spondylosis without myelopathy. (R. at 958.)  After discussion, they determined that she would have a right sided facet joint injection at L3-L4, L4-L5, and L5-S1.  (*Id.*)  Dr. Defauw believed that core strengthening and resetting muscle firing patterns would help Plaintiff and would allow her to maintain a lifestyle free of pain once accomplished.  (*Id.*)

On July 11, 2013, Plaintiff underwent right therapeutic lumbar facet injections at L3-L4, L4-L5, and L5-S1 levels for her lumbar spondylosis.  (R. at 964.)  She tolerated the procedure well, there were no complications, and she reported pain improvement of 50% with no motor or sensory changes at the time of discharge.  (R. at 964-65.)

On September 17, 2013, Plaintiff was seen by Tate C. Rubley, P.A,. at JPS for a medication follow-up appointment.  (R. at 868, 1149.)  She reported having more anxiety in the past 1-2 months and taking Visitril twice per day, but she did not feel it was helping her anxiety throughout the day. (*Id.*)  Her stress was caused by the fact that her daughter was living with the daughter's father in Florida, she did not have money to move to Florida, and she was worried that her daughter would not want to move back with her.  (*Id.*)  Her pain was elevated, but she was about to have a major back treatment and believed that would lower her stress.  (*Id.*)  Her noted diagnoses included major depressive disorder and ADHD, and her  GAF score at that time was 58.  (R. at 870.)

On September 19, 2013, and November 18, 2013, Plaintiff met with Dustin Lash, D.O., at JPS for follow-ups regarding her back pain.  (R. at 679, 755.)  She described her pain as achy in the S1 region bilaterally.  (*Id.*)  Dr. Lash noted that Plaintiff had a history of surgeries with only mild

relief.  (*Id.*)  Her pain was worse with activity and hyper-extension, and she denied any motor or sensory weakness or saddle paresthesia.  (*Id.*)  Her range of motion was normal, Faber's test was positive bilaterally, and she had no pain with facet loading.  (R. at 679-80, 755-56.)  She was alert, oriented to person, place, and time, and appeared well-developed and well-nourished.  (R. at 680, 756.)  At the September appointment, Dr. Lash determined that they should proceed with an injection of her right S1 joint because she did not get much relief with her right side facet injections, and also referred her to physical therapy for strengthening.  (R. at 681.)  She had her injection on October 10, 2013.  (R. at 687.)  The procedure went well without complications, Plaintiff's pain improved, and she had no motor changes at discharge.  (*Id.*)  At her November appointment, Dr. Lash determined that she should focus on physical therapy.  (R. at 756.)

On January 7, 2014, Amita Hegde, M.D., a state agency medical consultant (SAMC), completed a physical residual functional capacity (RFC) assessment based on the medical evidence. (R. at 217-19.)  She opined that Plaintiff had the physical RFC to lift and carry 20 pounds occasionally and 10 pounds frequently; stand and walk (with normal breaks) for about 6 hours in an 8-hour workday; sit (with normal breaks) for about 6 hours in an 8-hour workday; push and pull an unlimited amount of weight, other than shown for lift and carry, including operation of hand and foot controls; frequently climb ramps and stairs; occasionally climb ladders, ropes, or scaffolds; balance unlimitedly; occasionally stoop; and frequently kneel, crouch, and crawl, with no manipulative, visual, communicative, or environmental limitations. (R. at 218-19.)  In support, Dr. Hegde referenced Plaintiff's June 27, 2009 MRI, her February 11, 2012 MRI, her March 12, 2013 functional capacity evaluation, and her September 19, 2013 examination.  (*Id.*)  She also noted that Plaintiff's allegations were not supported by the evidence in the file.  (R. at 219.)

13

On March 10, 2014, Plaintiff saw Dr. Defauw again for back pain. (R. at 903.) Dr. Defauw noted that she was well known to him and had multiple procedures in the past, including an MRI that showed decreased lumbar lordosis, facet L4-5 and L5-S1 hypertophy, and degenerative discs noted at L5-S1 and L4-L5. (*Id*.) She previously underwent a procedure which provided relief on her left side, but then her right side began to hurt. (*Id*.) She then received an injection on her right side, but it was ineffective. (*Id*.) She voiced concern about having fibromyalgia, and described pain in her right and left triceps, on the back of her neck with some headaches, between her shoulder blades, and in her right and left upper lateral thighs. (*Id*.) She described a shooting pain like a "guitar string," and believed she needed more than just physical therapy. (*Id*.) Her pain was worse with walking or cooking but "better with Myalgias." (*Id*.) She localized her maximal point of tenderness as band-like across her low back and into her left piriformis area. (*Id*.) For range of motion, her back lateral bend on the right side was painful, and she had slightly less range of motion compared to her left side; she also had some pain on her left back lateral bend. (R. at 904.) Dr. Defauw noted that he thought her condition was caused by decreased core strength and muscular imbalances, and advised her that physical therapy was the best course of action. (R. at 904.) He also noted that physical therapy was for long term relief, and they could try for short term improvements through other therapies such as injections, medications, and/or manipulations. (R. at 904.)

On March 11, 2014, Plaintiff was seen by Dr. Rubley again for follow-up appointments. (R. at 1149, 1158.) Plaintiff stated that she had not been doing well the past few months, and reported elevated anxiety and depression levels. (R. at 1149.) She was also concerned about her weight gain. (*Id*.) She reported that Provigil helped her feel less foggy but she ran out of it. (*Id*.) She also stated that even though she was off Provigil for the past few months, she did not feel much different and

even felt a little clearer.  (*Id.*)  She reported attending knitting classes to learn something new and stimulate her mind.  (*Id.*)  Her noted diagnoses included major depressive disorder and ADHD, and she had a GAF score of 55 at that time.  (R. at 1151.)  They discussed increasing Cymbalta to help with her anxiety and depression and she was agreeable to that plan.  (R. at 1149.)

On April 15, 2014, Plaintiff was seen by Dr. Rubley again, and she presented as depressed and dysphoric.  (R. at 1158.)  She was still having issues with her daughter being in Florida, and her daughter had decided to stay in Florida for another year.  (*Id.*)  Her daughter was not communicating with her, and she was continuing to feel anxious during the daytime.  (*Id.*)  Cymbalta was working "ok," but she continued to have poor memory and no drive to accomplish anything.  (*Id.*)  She applied to DARS, and they did not want to call her back.  (*Id.*)  She felt as though she had no direction in life, and because her daughter did not want to return, she did not know what she was living for.  (*Id.*)  She did not think about suicide at all, however.  (*Id.*)  She also did not consider moving back to Florida because she "did not do well there."  (*Id.*)  She did not feel that Provigil helped and was willing to try a low dose of Klonopin for anxiety.  (*Id.*)  She had a GAF score of 55. (R. at 1160.)  A Partial Hospitalization Program (PHP) was discussed with her to help give her some direction.  (R. 1158.)

On April 8, 2014, Roberta Herman, M.D., an SAMC, completed a physical RFC assessment of Plaintiff based on the medical evidence of record.  (R. at 239-41.)  She opined that Plaintiff had the physical RFC to lift and carry 20 pounds occasionally and 10 pounds frequently; stand and walk (with normal breaks) for about 6 hours in an 8-hour workday; sit (with normal breaks) for about 6 hours in an 8-hour workday; push and pull an unlimited amount of weight, other than shown for lift and carry, including operation of hand and foot controls; frequently climb ramps and stairs;

occasionally climb ladders, ropes, or scaffolds; balance unlimitedly; occasionally stoop; and frequently kneel, crouch, and crawl, with no manipulative, visual, communicative, or environmental limitations. (R. at 239-40.)  In support of the exertional limitations, Dr. Herman referenced Plaintiff's June 27, 2009 MRI, her February 11, 2012 MRI, her March 12, 2013 functional capacity evaluation, and her September 19, 2013 examination.  (R. at 240.)  She also noted that Plaintiff's allegations were not supported by the evidence in the file.  (*Id.*)

On April 9, 2014, in her Function Report - Adult, Plaintiff reported that her memory was bad some days. but she was alert on other days; she could type but not all day; and she was not able to bend or mop due to lower back pain.  (R. at 460.)  She was able to prepare meals, do light housework, drive, shop for groceries, get along with authority figures, pay bills, and count change. (R. at 462-64, 466.) She also reported forgetting to take medication, lacking motivation, and lacking energy to be around people.  (R. at 462-64.)  She spoke to her mother and daughter on the phone. (R. at 464.)  She further reported that she could only lift 5-7 pounds due to carpal tunnel syndrome, walk 15-20 minutes, pay attention for 30 minutes, and follow short spoken instructions.  (R. at 465.)

Plaintiff was admitted to the PHP from April 22, 2014, until May 7, 2014, with a history of major depressive disorder, attention deficit disorder, and panic disorder.  (R. at 1167-1239, 1337-1363.)  She reported that she was passive aggressive and concerned about her weight.  (R. at 1167.) Her eyes were downcast, but she denied suicidal ideation, homicidal ideation, intent, plan, or desire. (*Id.*)  She initially showed minimal insight into the need to continue psychiatric treatment, which placed her at risk of relapse or deterioration, demonstrated low frustration tolerance and poor impulse control, and also demonstrated a lack of effective coping and decision making skills.  (R. at 1170.)  While in the PHP, Plaintiff participated in group therapy.  (R. at 1192, 1201-02, 1211-12,

1216-17, 1220-35, 1237-39, 1339-63.)  On April 29, 2014, she left PHP early to prepare for her knitting group and stated she had a desire to start doing things again.  (R. at 1217.)  Treatment notes for May 1, 2014, show that Plaintiff was motivated in the PHP, gained insight into her mental illness, and learned strategies for coping with her condition.  (R. at 1234.)  She felt that she was about 50% of the way to recovery at that point, and said she would know she reached recovery when she could wake up happy every day and be excited about doing things again.  (*Id.*)  On May 7, 2014, Plaintiff was found to be ready for discharge.  (R. at 1354.)  She reported improved motivation and assertiveness.  (*Id.*)  She understood herself better and had no suicidal ideation, intent, plan, or desire.  (*Id.*)  She stated that she worked with DARS to help her with job placement.  (*Id.*)  She also reported positive coping strategies such as walking, knitting, and rapport with her primary care physician.  (*Id.*)  She had bright affect, was in no apparent distress, and was discharged.  (*Id.*)

From April 24, 2014 to May 27, 2014, Plaintiff had follow-up appointments with Dr. Rubley. (R. at 1601, 1791-93, 1798-1800, 1801-02, 1803-05, 1808-10.)  At the April appointment, Dr. Rubley noted that she was extremely excited to talk about how the PHP had helped her in just two days.  (R. at 1791.)  She felt like there were others that felt like her, and stated that she was not sure if her medications were correct, but she would continue on the current regimen while in the PHP. (*Id.*)  She was neat, cooperative, alert, oriented to person, place, time, and situation, goal directed and logical, moderately depressed, and had fair judgment, concentration, and an intact memory.  (R. at 1792-93.)  She had a GAF score of 60.  (R. at 1793.)  On May 1, 2014, Dr. Rubley discussed the possible organic causes of Plaintiff's depression and fatigue with her.  (R. at 1798.)  Her mental status exam was the same as the prior appointment, except her judgment was noted to be good and fair.  (R. at 1799-1800.)  She had a GAF score of 63.  (R. at 1800.)

On May 2, 2014, Plaintiff continued to have trouble concentrating even after her depression was much more under control. (R. at 1801.) Her mental status exam and GAF score remained the same. (R. at 1801-02.) On May 7, 2014, Plaintiff was excited to be discharged from the PHP. (R. at 1803.) She felt confident, and had set up multiple groups to participate in. (*Id*.) She was appreciative of the program, and reported that her depression and energy went up from a 1 out of 10 to a 7 out of 10. (*Id*.) Her mental status exam remained the same, and she had a GAF score of 70. (R. at 1804-05.) On May 27, 2014, Plaintiff reported that she changed her primary care physician (PCP) because her last PCP decreased her Synthroid medication without checking the levels, and she did not know why the doctor did that. (R. at 1601, 1808.) She reported that she was about to go on a job interview, and that she became nervous to drive but would force herself to get up and go. (R. at 1601, 1808.) She believed she needed an increase in Provigil due to her continued struggles with concentration, and she continued to have trouble sleeping, so she was willing to try Doxepin. (*Id*.) She denied suicidal ideation. (*Id*.) Her mental status exam was the same, except she was minimally depressed, nervous, and anxious. (R. at 1809.) Her GAF score was 70. (R. at 1810.)

On August 14, 2014, Plaintiff saw John B. McClain, M.D., at JPS complaining of severe left shoulder/arm pain, back pain, and right elbow and ankle pain. (R. at 1382.) It hurt from her upper shoulder to her upper arm and to lift her arm, but there was no numbness or tingling. (*Id*.) She was not taking medication for the pain. (*Id*.) She had a vaccine in her right shoulder a week prior. (*Id*.) She stated that a prior nerve ablation procedure helped her back pain tremendously. (*Id*.) She was also concerned about losing weight and admitted to inactivity due to her back problems. (*Id*.) She reported that she continued to have a lot of family-related anxiety, was taking her medications twice a week, and was seeing her psychiatrist twice a week. (*Id*.) She also reported that she would get

18

angry and find herself screaming and getting very emotionally involved in problems, especially with her fiancé. (*Id.*) Dr. McClain recommended Iodine for pain; rest, massage, and heat for her back pain; and increased Klonopin. (R. at 1385.) He also discussed ways to reduce her anxiety and avoid engagement with her fiancé. (*Id.*)

On September 2, 2014, and October 29, 2014, Plaintiff met with Sarah L. Strebeck, M.D. (R. at 1601, 1811, 1829.) In September, she reported a down mood and sleep issues. (R. at 1601, 1811.) She had difficulty sleeping at night but would then be sleepy all day. (*Id.*) She also reported that she had panic attacks at times and would take Clonazepam three times per day. (*Id.*) In her mental status exam, she appeared neat, alert, minimally depressed, minimally nervous/anxious, oriented to person, place, time, and situation, and cooperative. (R. at 1812.) Her concentration was good and her memory was intact. (*Id.*) Her GAF score was 60. (R. at 1813.) In October, she reported increased stress and anxiety as a result of not receiving $300 per month from her disability provider for her medical expenses. (R. at 1601, 1829.) She began working part-time as a translator, which was a new job for her. (*Id.*) Provigil was discontinued because Dr. Strebeck did not think that she actually had ADHD after reviewing her medical chart. (*Id.*) Her mental status exam was the same, and she had a GAF score of 75. (R. at 1822-24.)

On November 6, 2014, Plaintiff met with Dr. McClain for back pain. (R. at 1826.) She stated she had new back pain that started five days before her visit. (*Id.*) Her right lower back hurt, and the pain increased with movement. (*Id.*) It was not radiating pain, and there were no bladder or bowel problems. (*Id.*) Dr. McClain noted that Plaintiff previously met with Dr. Strebeck and changed medications, and her sleep and mood had improved. (R. at 1826.) She was alert and cooperative, and her back was moderately tender with palpable spasms in the right mid to lower

lumbar paraspinous muscles. (R. at 1829.) She had full range of motion but pain with flexion and extension. (*Id.*)

On January 15, 2015, Plaintiff saw Florence Choi, Nurse Practitioner, for a follow-up. (R. at 1529-30, 1601.) She stated that she had been doing well, was running out of sleep medication, and felt angry at times. (*Id.*) She continued to work as a translator/Spanish interpreter and reported the occasional use of alcohol. (*Id.*) She appeared neat and with an unimpaired gait. (R. at 1531.) She was cooperative, alert, oriented to person, place, time, and situation, goal directed, well-organized, minimally depressed, and had good concentration and an intact memory. (*Id.*) She had a GAF score of 70. (R. at 1533.)

On February 26, 2015, March 25, 2015, and May 28, 2015, Plaintiff was treated by Rohini Ravindran, M.D., at JPS. (R. at 1601.) In February, she reported that she was anxious, had panic attacks before bed, and that she would scream at people because she would get furious. (*Id.*) She stated she could not work as an interpreter because of memory issues, and she was upset about her daughter going to live with the daughter's dad. (*Id.*) Plaintiff's boyfriend of three years said she was emotional. (*Id.*) In March, she stated that she could not sleep without Ambien because her heart raced and she was anxious, and that this happened for one month. (R. at 1601, 1861-62.) She complained of lip swelling due to her medication, and Dr. Ravindran switched her from Abilify to Seroquel. (*Id.*) In May, Plaintiff reported that she did not take the Seroquel because the side effects worried her. (R. at 1601, 1867.) She took Paxil and believed she needed a 40mg dosage. (*Id.*) At her March and May appointments, she appeared neat and had an unimpaired gait. (R. at 1602, 1863-64, 1869.) She was cooperative, alert, minimally depressed, oriented to person, place, time, and situation, goal directed, well-organized, and showed good judgment. (R. at 1602-03, 1863-64,

20

1869.)  She also had good concentration and an intact memory.  (R. at 1602, 1863-64, 1869.)  Her GAF scores in March and May were 70.  (R. at 1604, 1865, 1870.)

An x-ray of Plaintiff's cervical spine was performed on September 3, 2015 due to paresthesia in her arms.  (R. at 1922.)  It showed mild disc space narrowing with spurring/spondylosis, and slight retrolisthesis with mild right bony foraminal encroachment at C5-6, as well as mild straightening of the cervical lordolic curve.  (*Id.*) The alignment was otherwise within normal limits.  (*Id.*)  No fractures, prevertebral soft tissue swelling, or other subluxation was identified.  (*Id.*)

On October 23, 2015, Plaintiff saw Farhana Amir, M.D., for back pain.  (R. at 1880.)  She reported that she still had low back pain, was three years out from treatment, and thought it was getting worse.  (*Id.*)  She felt burning in her feet but no numbness in her legs.  (*Id.*)  She also had numbness in her hands that happened more at night.  (*Id.*)  She was provided with Tramadol and Lyrica, as well as instructions to schedule a follow-up appointment, and discharged in stable condition.  (R. at 1882.)

Plaintiff met with Dr. Rubley again on November 23, 2015.  (R. at 1930.)  She reported that she had been off her medications for two weeks, and that she did not feel they were working anyway.  (*Id.*)  She had not been in psychiatry for over six months.  (*Id.*)  She reported "always getting angry," and that her family often asked if she was taking her medications.  (*Id.*)  Her sister had moved in with her, and Plaintiff stated there was a constant conflict between them because of their different personalities.  (*Id.*)  She also reported that she was working as a Spanish interpreter and enjoyed being out of the house.  (*Id.*)  Although she did not feel Paxil worked, she requested to restart it and admitted that she recognized her irritability more when she was off of it. (*Id.*)  She was neat, cooperative, alert, moderately depressed, oriented to person, place, time, and situation, goal

21

directed and logical, well organized, and showed fair judgment, good concentration, and an intact memory.  (R. at 1931-32.)  She had a GAF score of 65.  (R. at 1932.)

    **3.**    **Hearing Testimony**

On November 30, 2015, Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ.  (R. at 144-91.)  Plaintiff was represented by an attorney.  (R. at 146.)

    *a.*    *Plaintiff's Testimony*

Plaintiff testified that she was 48 years old, 5-feet 9-inches tall, and weighed about 286 pounds.  (R. at 151, 175.)  She last worked as a secretary in Puerto Rico in 2007.  (R. at 151, 154.) She stopped working because after several absences, her employer sent her to three different doctors and subsequently offered her disability retirement due to medical conditions.  (R. at 154.)  Her conditions involved her back and hands, and she had carpal tunnel.  (*Id*.)  She never had surgery on her hands; it was never recommended.  (R. at 154-55.)  Her hands felt better after she stopped working because she was no longer typing every day, but at the time of the hearing, her hands were becoming numb.  (R. at 155-57.)  Because her back pain was more intense, treatment was focused on that area rather than on her hands.  (R. at 155.)  Her doctors "decided to . . . work the back problem just to see if that [was] causing nerves in [her] hands," and they were going to conduct a nerve test on her body.  (R. at 156.)  Testing was done on her back, and doctors "decided to burn the nerves of [her] back, and that helped . . . ."  (*Id*.)  Her back pain was better following the treatment, but it was getting worse, and the pain would move down to her legs and feet.  (R. at 160-61.)  Tests were also performed on Plaintiff's neck.  (R. at 157.)  She experienced spasms and would get intense headaches that lasted about four hours on a weekly basis.  (R. at 157–58.)  She would have to lie down and would also feel nauseous.  (R. at 158.)

Plaintiff stated that she did not always hear correctly or clearly, and she would feel anxious when talking on the phone because she could not always understand what was said. (R. at 161.) She also had trouble reading due to problems with her vision, and doctors found that her "natural lenses in [her] eyes [had] yellow spots . . . that [could] be removed with surgery" but she did not have money for that surgery. (R. at 162.) She had glasses and they did not help, but she wore them constantly, could see far away with them, and could read with them even though it was difficult. (R. at 162–64.)

Plaintiff had received treatment for her depression and anxiety in an intensive outpatient program, and also took medicine and received counseling "for a very long time." (R. at 164-65.) She believed that those issues started as a result of her "being so young and so ill," and thought that they would not be an issue if she were healthy. (R. at 164.) Her depression could be "very major" but at other times would be more manageable; it was much better at the time of the hearing. (R. a 165.) She had panic attacks daily and took medicine once she would have an attack in order to calm herself down. (R. at 166-67.) She was not very social and tried to avoid situations where she would be around many people. (R. at 168.) She also had trouble remembering things, concentrating, and staying on task. (*Id.*)

Plaintiff could be seated in an office chair for about half an hour, but she preferred walking around; standing was more difficult than walking. (R. at 169-70.) She thought she could stand for about 50 minutes at a time and walk a little bit more than that. (R. at 170.) She laid down about three times a day for about 20 minutes at a time. (R. at 170-71.) Sitting was uncomfortable for her, and she could only rest her back by laying down. (R. at 171.) She also struggled with washing dishes and cooking; after about 15-20 minutes she would take a break. (*Id.*) She did not have "the

strength enough to open jars and stuff like that," but could hold a cup. (R. at 172.)

Plaintiff went to DARS for testing of her work capabilities. (*Id.*) Through DARS, she was able to start a job as a translator about a year prior to the hearing. (R. at 165-66, 172.) That was the only job she had worked since the alleged onset date. (R. at 166.) Her job consisted of translating for patients during medical appointments. (R. at 168-69.) She was paid $18 per hour and only worked when she accepted an assignment; each assignment was for a minimum of two hours. (R. at 172-73.) She tried to accept three assignments per week. (R. at 173.)

### b.    VE's Testimony

The VE testified that Plaintiff had previous work experience as a routine office clerk, DOT 209.562-010 (SVP 3, light, semi-skilled). (R. at 177.)

The ALJ asked the VE to consider a hypothetical individual with the same age, education, and work history as Plaintiff. (*Id.*) The individual could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and walk 4 hours out of 8 hours; sit 6 hours out of 8 hours; understand, remember, and carry out detailed, but not complex instructions; occasionally climb ramps or stairs; occasionally stoop or kneel; occasionally perform overhead reaching, but otherwise reaching would be frequent; occasionally have contact with co-workers, supervisors, and incidental public contact; never climb ladders, ropes, or scaffolds; never balance on narrow objects such as an elevated walkway; and never crouch or crawl. (R. at 177-78.) The individual also could not work in concentrated exposure to temperature or weather extremes, drive as an essential job duty, or work with hazards, including unprotected heights, moving machinery parts, or open flames. (R. at 178.)

The ALJ asked the VE if the individual would be able to perform Plaintiff's past work with the stated limitations. (*Id.*) The VE responded that the individual could perform Plaintiff's past work

as it was performed, but not as it was described in the DOT.  (R. at 179.)  The ALJ then asked the VE if there was any other work that the individual could perform.  (*Id*.)  The VE responded that the individual could work as a final assembler, DOT 713.687-018 (SVP 2, sedentary, unskilled), with about 8,300 jobs in Texas, and about 130,200 jobs nationally; a garment sorter, DOT 222.687-014 (SVP 2, light, unskilled), with about 4,000 jobs in Texas, and about 53,000 jobs nationally; or a sorter, DOT 569.687-022 (SVP 2, light, unskilled), with about 3,500 jobs in Texas, and about 47,000 jobs nationally.  (R. at 179-80.)  The ALJ asked the VE if her responses would change if the individual could also frequently handle and finger.  (R. at 180.)  The VE responded that they would not change with regard to both past work as actually performed and other work.  (*Id*.)

The ALJ then asked the VE to consider the same hypothetical individual with frequent handling and fingering, but the individual's capabilities would be reduced to sedentary such that the individual would only be able to lift and carry a maximum of 10 pounds.  (*Id*.)  The ALJ asked if this individual could perform past work or other work.  (*Id*.)  The VE responded that the individual could perform past work as performed, and could perform other work as "an addressing," DOT 209.587-010 (SVP 2, sedentary, unskilled), with about 1,100 jobs in Texas, and about 24,700 jobs nationally; or a surveillance system monitor, DOT 379.367-010 (SVP 2, sedentary, unskilled), with about 900 jobs in Texas, and about 16,600 jobs nationally.  (R. at 180-81.)  The ALJ next asked the VE to classify Plaintiff's translator job.  (R. at 181.)  The VE classified the job as interpreter, DOT 137.267-010 (SVP 6, sedentary, skilled).  (*Id*.)

The ALJ asked the VE what the tolerance for absenteeism was.  (*Id*.)  The VE responded that it would be difficult to maintain competitive employment with absences of two or more days per month.  (*Id*.)  The ALJ then asked the VE what the tolerance was for someone to go off task above

25

their scheduled breaks.  (*Id.*)  The VE responded that if an individual was off task 10% of the time or more, then it would be difficult to maintain competitive employment.  (*Id.*)

Plaintiff's attorney asked the VE about her opinion that the individual who could frequently handle and finger could perform Plaintiff's past work as described.  (R. at 181-82.)  The VE responded that she missed the constant fingering, and the past work could not be performed by that hypothetical individual.  (R. at 182.)  Plaintiff's attorney asked the VE to clarify which job did not carry over, and the VE clarified that the final assembler job did not carry over.  (*Id.*)  Plaintiff's attorney then asked the VE if it would affect her answer if the individual's handling and fingering were reduced to no more than occasional.  (R. at 183.)  The VE responded that all jobs would be eliminated except for system surveillance monitor.  (*Id.*)

Plaintiff's attorney asked the VE if whether Plaintiff's limitations would be light, sedentary, or less if she could lift at waist level only with "occasional posturals;" stand for 10-15 minutes at a time with total standing tolerance limited to occasional only; walk for 5-10 minutes or a maximum of 300 feet at a time with total walking tolerance limited to occasional only; and never squat or crouch.  (*Id.*)  The VE responded that her limitations would be sedentary.  (*Id.*)  The VE then stated the limitations for an individual limited to working only 4 to 6 hours a day would be less than sedentary.  (R. at 184.)  Plaintiff's attorney next asked the VE to consider a hypothetical where the individual had physical limitations due to her back, neck, shoulder, and hand, and could lift no more than 10 pounds; never lift above her waist; never bend continuously; never climb more than 3 steps; never walk more than 5-10 minutes; never stand more than 10-15 minutes; never constantly sit, kneel, or squat; and never continuously perform repetitive hand motions.  (R. at 185-86.)  The individual also needed to frequently change positions and had an inconsistent memory.  (R. at 186.)

Plaintiff's attorney asked if this individual would be at the sedentary, light, or less than sedentary level. (R. at 187.) The VE responded that the individual would be sedentary, but it would be difficult to maintain competitive employment with the frequent changing of positions. (*Id*.)

Plaintiff's attorney asked the VE if any of her testimony was in conflict with the DOT or not covered by it. (R. at 189.) The VE responded that her testimony was not in conflict, but stated that the DOT did not address the standing and walking for 4 out of 8 hours, so her opinions of job examples and numbers in that hypothetical were based on her education and experience. (*Id*.) The VE then stated that she also addressed the limitation on overhead reaching based on her education and experience. (*Id*.)

## C.    <u>ALJ's Findings</u>

The ALJ issued her decision denying benefits on April 19, 2016. (R. at 260-70.) At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since June 28, 2011, the alleged onset date. (R. at 263.) At step two, the ALJ found that she had the following severe impairments: lumbar degenerative disc disease, cervical degenerative disc disease, and obesity. (*Id*.) Despite those impairments, at step three, the ALJ found that Plaintiff had no impairments or combination of impairments that met or equaled the severity of one of the impairments listed in the social security regulations. (R. at 266.)

Next, the ALJ determined that Plaintiff retained the RFC to perform a reduced range of light work. (*Id*.) Specifically, the ALJ determined that Plaintiff could: lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk 4 hours in an 8-hour workday; sit 6 hours in an 8-hour workday; occasionally climb ramps and stairs; never climb ladders, ropes or scaffolds; never perform balancing on narrow objects such as elevated walkways; never crouch or crawl;

occasionally stoop and kneel; occasionally reach overhead; and frequently reach in all directions other than overhead.  (*Id*.)  The ALJ further determined that Plaintiff could not work in concentrated temperatures or weather extremes, drive as an essential job duty, or work with hazards, including unprotected heights, moving machinery parts, or open flames.  (*Id*.)

At step four, the ALJ relied on the VE's testimony in determining that Plaintiff was capable of performing her past relevant work as an office clerk.  (R. at 268-69.)  Although the ALJ found that Plaintiff was capable of performing her past relevant work, the ALJ continued to step five and relied on the VE's testimony to find Plaintiff capable of performing work that existed in significant numbers in the national economy, including jobs such as final assembler, garment sorter, and sorter. (R. at 269-70.)  Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, from June 28, 2011, through April 19, 2015.  (R. at 270.)

## II.  LEGAL STANDARD

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence.  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3).  Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion.  *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995).  In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present.  *Greenspan*, 38 F.3d at 236.  A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible

evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id*. The Court may therefore rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id*.

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1.      An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.      An individual who does not have a "severe impairment" will not be found to be disabled.

3.      An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of

29

vocational factors.

4.   If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.   If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id*. Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### III. ISSUES FOR REVIEW

Plaintiff presents four issues for review:

1.   Did the ALJ properly consider all of Plaintiff's medically determinable impairments in evaluating her residual functional capacity (RFC)?

     The Plaintiff contends that the answer is "No."

2.   Did the ALJ properly consider medical opinion evidence in determining [RFC]?

The Plaintiff submits that the answer is "No."

3.    Did the ALJ properly consider all of Plaintiff's work-related limitations in determining that she can perform her past work and other work?

The Plaintiff asserts that the answer is "No."

4.    Did the ALJ establish that Plaintiff can return to her former work, or that other work exists, in significant numbers, which she can perform?

The Plaintiff argues that the answer is "No."

(doc. 17 at 3-4.)

A.    **Severe Impairment**

Plaintiff argues that the ALJ failed to consider all of her impairments in assessing her RFC. (doc. 17 at 10.)  She claims that the ALJ erred in finding that her ADHD, depression and anxiety, and carpal tunnel syndrome, neuropathy, and functional limitations in the use of her hands were not severe impairments that affected her ability to perform work-related activities. (*Id*. at 10-12.)  The Commissioner responds that the ALJ properly considered these impairments in determining Plaintiff's RFC.  (doc. 19 at 10.)

At step two of the sequential evaluation process, the ALJ "must consider the medical severity of [the claimant's] impairments."  20 C.F.R. § 404.1520(a)(4)(ii), (c).  To comply with this regulation, the ALJ "must determine whether any identified impairments are 'severe' or 'not severe.'"  *Herrera v. Comm'r of Soc. Sec.*, 406 F. App'x 899, 903 (5th Cir. 2010).  Under the Commissioner's regulations, a severe impairment is "any impairment or combination of impairments which significantly limits [a claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  The Fifth Circuit has held that a literal application of this regulation would be inconsistent with the Social Security Act because the regulation includes fewer conditions than

31

indicated by the statute. *Stone v. Heckler*, 752 F.2d 1099, 1104–05 (5th Cir. 1985). Accordingly, in the Fifth Circuit, an impairment is not severe "only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work." *Id*. at 1101. In other words, "the claimant [need only] make a de minimis showing that her impairment is severe enough to interfere with her ability to do work." *Anthony v. Sullivan*, 954 F.2d 289, 294 n.5 (5th Cir. 1992) (citation omitted). When determining whether a claimant's impairments are severe, an ALJ is required to consider the combined effects of all physical and mental impairments regardless of whether any impairment, considered alone, would be of sufficient severity. *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000) (citing 20 C.F.R. § 404.1523). The claimant has the burden to establish that her impairments are severe. *See Bowen v. Yukert*, 482 U.S. 137, 146 n.5 (1987).

Here, the ALJ found that Plaintiff's lumbar degenerative disc disease, cervical degenerative disc disease, and obesity were severe impairments. (R. at 263.) She determined that GERD was a non-severe impairment that was not expected to significantly interfere with Plaintiff's ability to work; ADHD was not a severe impairment based on the evidence, a lack of testing, and lack of a definitive ADHD diagnosis; and her depression and anxiety were not severe impairments because they did not cause more than minimal limitations in her ability to perform basic mental work activities. (R. at 263-264.)[3] The ALJ did not address the impairments related to Plaintiff's hands. (*See* R. at 263-66.)

---

[3] Plaintiff does not argue that the ALJ applied an incorrect standard for evaluating a severe impairment under *Stone v. Heckler*, 752 F.2d 1099 (5th Cir. 1985). (doc. 17 at 10-12.)

### 1.    ADHD

Plaintiff points to the medical records from Dr. Warren and Dr. Rubley as evidence of her ADHD.  (doc. 17 at 10-11.)  Dr. Warren's medical records show that he conducted psychological testing and found that Plaintiff demonstrated a significant impairment in her attention concentration to auditory stimuli, but not visual stimuli.  (R. at 499.)  He opined that her IQ was likely 5-10 points higher than her test results, but she was adversely affected by problems with attention concentration.  (R. at 500.)  He also opined that she had symptoms of thought disorder, likely attributable to depression and attention deficit disorder.  (*Id*.)  His diagnostic impressions indicated, in part, ADHD of the primarily inattentive type.  (R. at 501.)  ADHD was not part of Plaintiff's medical history prior to the testing by Dr. Warren.

Following her testing, Plaintiff met with Nurse Vickers who discussed her ADHD symptoms with her, and provided her with a prescription for Provigil after she expressed interest in ADHD treatment.  (R. at 580, 582.)  She informed Nurse Vickers at a subsequent appointment that Provigil helped her feel less foggy, more organized, and like she was completing tasks more often, but she did not feel as noticeable of a change as she had hoped.  (R. at 587.)  In March 2014, Plaintiff reported to Dr. Rubley that she had been out of Provigil, which was prescribed for ADHD, and she stated that she felt clearer being off of Provigil.  (R. at 1058-59; *see* R. at 582.)  Dr. Rubley's medical records note ADHD in the DSM VI Diagnoses section.  (R. at 1039, 1061.)  As noted by the ALJ, however, Dr. Strebeck ultimately determined that it was doubtful Plaintiff actually had ADHD after reviewing her medical chart, and discontinued Provigil without adding other medication.  (R. at 263; *see* R. at 1601, 1829.)  The ALJ relied on Dr. Strebeck's determination in making her decision.  (R. at 263.)  There is no other medical evidence of Plaintiff's ADHD, and

opinion evidence from her May of 2013 vocational evaluation only noted that she had inconsistent attention to auditory stimuli. (R. at 425.)

Plaintiff has not shown that ADHD was a medical impairment severe enough to interfere with her ability to do work. *Anthony*, 954 F.2d at 294 n.5. Rather, the medical evidence shows substantial evidence to support the ALJ's finding that ADHD was not a medically determinable impairment that would interfere with her ability to perform work-related activities. *See Andrews v. Astrue*, 917 F. Supp. 2d 624, 639 (N.D. Tex. 2013) (finding no error when the ALJ determined an impairment to be non-severe, even though the SAMC found moderate limitations due to the impairment, because there was a lack of examining medical evidence showing any effect on the plaintiff's ability to work); *see also McDaniel v. Colvin*, No. 4:13-CV-989-O, 2015 WL 1169919 at *5 (N.D. Tex. Mar. 13, 2015) (finding that the ALJ did not err in finding impairments to be non-severe because the ALJ considered the relevant evidence in his decision and the plaintiff did not point to evidence showing "any work-related limitations beyond those already found by the ALJ"). Accordingly, the ALJ did not err.

### 2. *Depression and Anxiety*

Plaintiff relies upon Dr. Warren's psychological testing, Mr. Nichols' functional capacity evaluation, and the 3-day vocational evaluation with Goodwill as evidence of the severity of her depression and anxiety. (doc. 17 at 11.) Dr. Warren observed that Plaintiff demonstrated well-developed interpersonal skills and positive relatedness, her mood was mildly dysphoric and anxious, and there was no evidence of any thought or perceptual disorder. (R. at 499.) He opined that the results of Plaintiff's personality testing were consistent with her history of depression and chronic pain, and that her symptoms of thought disorder were partially attributable to depression. (R. at

34

500.)  His diagnostic impressions indicated, in part, major depression in partial remission.  (R. at 501.)  He further noted that her vocational limitations partially included her history of depression and anxiety.  (R. at 501.)  Mr. Nichols noted that Plaintiff's main complaints were panic attacks and low back pain, and he opined that limiting factors included poor symptom management.  (R. at 394.) In the vocational evaluation, her vocational limitations were found to include depression and anxiety, which limited emotional coping, and the evaluator opined that Plaintiff's limited emotional coping could add to the challenge of performing a typical sedentary job.  (R. at 1305, 1307.)

In her decision, the ALJ noted that Plaintiff had reported and been in treatment for depression and anxiety, but the record showed that she generally experienced only mild symptoms with treatment.  (R. at 263.)  Consistent with this observation, she found that medical records showed that Plaintiff was managing okay on her medications, able to get things done, felt happier, slept better, and noticed improvement with her anxiety.  (*Id*.)  The ALJ also noted that mental status exams documented normal activity level, cooperative behavior, full affect, good concentration, intact memory, goal directed and logical thought processes, good judgment and insight, and no suicidal ideation, delusions, hallucinations, or aggression.  (*Id*.)  She recognized that Plaintiff's anxiety and depression increased in March 2014, and the following month.  (*Id*.)

The ALJ then considered Plaintiff's treatment at the PHP, during which she participated in group therapy, and noted that Plaintiff met her personal goals, improved her motivation and assertiveness, understood herself better, met the criteria for discharge, and had a bright affect and was in no apparent distress at the time of discharge.  (R. at 264.)  Plaintiff also reported working with DARS for job placement and having positive coping skills as a result of the PHP.  (*Id*.)  The ALJ noted that Plaintiff did well after the PHP and began working as a Spanish interpreter, and that

35

Plaintiff's continued work contradicted her reports of problems dealing with the public and memory problems. (*Id.*) Additionally, the ALJ noted that Plaintiff consistently had normal mental status exams, and that she had GAF scores of 60-63 in 2012, one GAF score of 58 in September 2013, and GAF scores of 70 since her time at the PHP. (*Id.*) Based upon the evidence, the ALJ used the proper technique[4] to determine that Plaintiff's depression and anxiety resulted in no episodes of decompensation and caused only "mild limitations" as to her functional areas of daily living, social functioning, and concentration, persistence, and pace. (R. at 265-66.) The ALJ ultimately accorded great weight to the SAMCs' determinations that Plaintiff had no more than mild limitations in the relevant functional areas. (*Id.*)

Plaintiff has not shown that her depression and anxiety were severe impairments, and substantial medical evidence instead supports the ALJ's findings that her depression and anxiety did not interfere with her ability to perform work-related activities. *See Hammond v. Barnhart*, 124 F. App'x 847, 853 (5th Cir. 2005) (holding that, even though there was "some evidence that point[ed] to a conclusion that differ[ed] from that adopted by the ALJ," there was no error because there was "far more than a scintilla of evidence in the record that could justify [the] finding that [the plaintiff's] impairments were not severe disabilities"); *see also Andrews*, 917 F. Supp. 2d at 639. Accordingly, the ALJ did not err by finding Plaintiff's depression and anxiety to be non-severe impairments.

### 3.    *Carpal Tunnel Syndrome, Neuropathy, and Functional Use of Hands*

Plaintiff primarily relies on her testimony and the vocational evaluation as evidence that

---

[4] The "special technique" for evaluating the severity of mental impairments is described in 20 C.F.R. § 404.1520a.

carpal tunnel syndrome, neuropathy, and functional limitations in the use of her hands were severe impairments. (doc. 17 at 12.) Plaintiff testified that she had carpal tunnel syndrome and problems with her hands, and although her hands felt better after she stopped working because she was not typing anymore, they were starting to feel numb. (R. at 154-57.) She could hold a cup but not open jars. (R. at 172.) She never had surgery on her hands and it was not recommended. (R. at 154-55.) In the vocational evaluation, Plaintiff scored well below average on the Purdue Pegboard Test for fine finger dexterity, had difficulty performing repetitive hand motions, and was found to have physical limitations due to her hand conditions. (R. at 421, 425.) The evaluator also specifically noted that Plaintiff had questionable hand tolerance because of carpal tunnel syndrome and neuropathy. (R. at 427.) The ALJ did not discuss Plaintiff's carpal tunnel syndrome, neuropathy, and functional limitations in the use of her hands at step two. (*See* R. at 263-66.)

Here, in determining Plaintiff's RFC, the ALJ considered Plaintiff's testimony and medical evidence related to the use of her hands. (R. at 267.) The ALJ's decision notes that Plaintiff never had surgery on her hands, surgery was not recommended, and her symptoms improved after she stopped typing on the daily basis. (*Id.*) She also noted that Plaintiff reported that she attended knitting classes and joined a knitting group, and that there was a lack of any treatment or diagnoses of impairments in the use of her hands. (*Id.*)

Plaintiff asserts that the ALJ erred in failing to consider impairments related to the use of her hands. (doc. 17 at 12.) The Commissioner responds that the ALJ considered the evidence related to Plaintiff's hands, and even if the limitations related to her hands were not properly considered, such error was harmless because the ALJ proceeded beyond step two. (*Id.* at 12-13.)

The Fifth Circuit has stated that a failure to make a severity finding at step two is not

reversible error when an ALJ continues with the sequential evaluation process. *Herrera*, 406 F. App'x at 903 (citing *Adams v. Bowen*, 833 F.2d 509, 512 (5th Cir. 1987)) (noting the ALJ's failure to make a severity finding at step two was not a basis for remand where the ALJ proceeded to later steps of the analysis); *Mays v. Bowen*, 837 F.2d 1362, 1365 (5th Cir. 1988) (per curiam) ("[I]f the ALJ proceeds past the impairment step in the sequential evaluation process the court must infer that a severe impairment was found."). Even if the ALJ erred in failing to consider whether carpal tunnel syndrome, neuropathy, and functional limitations related to the use of Plaintiff's hands were severe impairments, the error was harmless because she proceeded beyond step two. *See Norris v. Berryhill*, No. 3:15-CV-3634-BH, 2017 WL 1078524, at *13 (N.D. Tex. Mar. 22, 2017) (finding that even if the ALJ erred in failing to explain why he found only certain impairments to be severe, the error was harmless where he proceeded with the sequential evaluation process).

**B.    RFC Determination**

Plaintiff argues that the ALJ erred by failing to consider medical opinion evidence in determining her RFC. (doc. 17 at 12-15.)

Residual functional capacity, or RFC, is defined as the most that a person can still do despite recognized limitations. 20 C.F.R. § 404.1545(a)(1). The RFC determination is a combined "medical assessment of an applicant's impairments with descriptions by physicians, the applicant, or others of any limitations on the applicant's ability to work." *Hollis v. Bowen*, 837 F.2d 1378, 1386–87 (5th Cir. 1988) (per curiam). It "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996). An individual's RFC should be based on all of the relevant evidence in the case record, including opinions submitted by treating

physicians or other acceptable medical sources.  20 C.F.R. § 404.1545(a)(3) (2012); SSR 96-8p, 1996 WL 374184, at *1.

The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity."  *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985). The ALJ may find that a claimant has no limitation or restriction as to a functional capacity when there is no allegation of a physical or mental limitation or restriction regarding that capacity, and no information in the record indicates that such a limitation or restriction exists.  *See* SSR 96-8p, 1996 WL 374184, at *1.  The ALJ's RFC decision can be supported by substantial evidence even if she does not specifically discuss all the evidence that supports her decision or all the evidence that she rejected.  *Falco v. Shalala*, 27 F.3d 16, 164 (5th Cir. 1994).  A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record.  *Leggett*, 67 F.3d at 564.  Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings."  *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted).  The Court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the" ALJ's decision.  *Id.*  Courts may not reweigh the evidence or substitute their judgment for that of the Secretary, however, and a "no substantial evidence" finding is appropriate only if there is a "conspicuous absence of credible choices" or "no contrary medical evidence."  *See Johnson*, 864 F.2d at 343 (citations omitted).

### 1.    *Opinion Evidence*

Plaintiff asserts that the ALJ failed to consider or give any weight to the opinions of Dr.

Warren, Mr. Nichols, or to the opinions in the vocational evaluation.  (doc. 17 at 12-15.)[5]  The Commissioner concedes that the ALJ did not address these opinions.  (doc. 19 at 15.)

The Commissioner is entrusted to make determinations regarding disability, including weighing inconsistent evidence. 20 C.F.R. §§ 404.1520b(b) and 404.1527(c) (2012).  Every medical opinion is evaluated regardless of its source.  20 C.F.R. § 404.1527(c)(1) (2012).  Additionally, the regulations require the ALJ to consider evidence from "other sources" as part of considering all of the available evidence, because such evidence might show the severity of an impairment and how it affects a claimant's ability to function.  SSR 06–3p, 2006 WL 2329939, at *2 (S.S.A. Aug. 9, 2006).  Generally, an opinion from an examining source is given more weight than the opinion from a non-examining source.  20 C.F.R. § 404.1527(c)(1) (2012).  However, the "standard of deference to the examining physician is contingent upon the physician's ordinarily greater familiarity with the claimant's injuries. [W]here the examining physician is not the claimant's treating physician and where the physician examined the claimant only once, the level of deference afforded his opinion may fall correspondingly." *Rodriguez v. Shalala*, 35 F.3d 560, 1994 WL 499764, at *2 (5th Cir. 1994) (unpublished) (citing *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990)).  The ALJ is also free to reject the medical opinion of any physician when the evidence supports a contrary conclusion. *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1981).  Moreover, "[w]hen a treating or examining physician's opinions are inconsistent with other substantial evidence in the record, the opinions are not entitled to any specific weight in the ALJ's decision." *Smith v. Comm'r of Soc. Security Admin.*, No. 4:12–CV–00625–DDB, 2014 WL 4467880 at*3 (E.D. Tex. Sept. 9, 2014);

---

[5] Plaintiff also argues that the opinions from Mr. Nichols and the vocational evaluation should have been considered as required by SSR 06–3p, 2006 WL 2329939, at *2 (S.S.A. Aug. 9, 2006).  (doc. 17 at 14-15.)

*Morvant v. Comm'r of Soc. Security Admin.*, No. 12–CV–2716, 2014 WL 868912, at *9 (W.D. La. Feb. 28, 2014) (same).

The Commissioner appears to argue that it was unnecessary to consider the unaddressed opinion evidence because opinions from Plaintiff's treating physician contradicted Dr. Warren's findings, Dr. Warren did not provide an opinion about Plaintiff's RFC, and evidence contradicted the findings in Mr. Nichols' evaluation and the vocational evaluation. (doc. 19 at 15-16.) An ALJ's decision "must stand or fall with the reasons set forth in [his] decision, as adopted by the Appeals Council," however. *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000). It is well-established that a court may only affirm the ALJ's decision "on the grounds which [she] stated for doing so." *Cole v. Barnhart*, 288 F.3d 149, 151 (5th Cir. 2002) (per curiam). An "ALJ must consider all the record evidence and cannot 'pick and choose' only the evidence that supports [her] position." *Loza*, 219 F.3d at 393. Additionally, the ALJ must "'explain the weight given to opinions from . . . other sources, or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning . . . .'" *Ealy v. Colvin*, No. 3:13CV409TSL-JCG, 2014 WL 3928193, at *4 (S.D. Miss. Aug. 12, 2014) (quotations omitted) (quoting SSR 06–3p, 2006 WL 2329939, at *6).

Here, the ALJ did not mention Dr. Warren's opinion, Mr. Nichols' opinion, or the opinions in the vocational evaluation. (*See* R. at 260-70.) Accordingly, the ALJ erred by failing to weigh or even consider these opinions in her decision. *See Loza*, 219 F.3d at 393; *see also Brooks v. Colvin*, No. 15-14-JWD-RLB, 2016 WL 3675481, at *8 (M.D. La. June 15, 2016) (finding error where an ALJ did not mention or discuss a medical opinion); *compare Golas v. Colvin*, No. 3:13-CV-4110-BN, 2014 WL 2587633 at *5 (N.D. Tex. June 10, 2014) (finding error when an ALJ

41

did not consider or expressly assign weight to an SAMC's opinion).

### 2.    Harmless Error

The Commissioner argues that any error in failing to address the opinion evidence at issue was harmless.  (doc. 19 at 16-17.)  Plaintiff responds that "it cannot be said that the ALJ's failure to consider these medical and vocational opinions 'did not compromise the decision-making process.'"  (doc. 21 at 5-6.)

The Fifth Circuit has held that "[p]rocedural perfection in administrative proceedings is not required" and a court "will not vacate a judgment unless the substantial rights of a party are affected."  *Mays v. Bowen*, 837 F.2d 1362, 1363–64 (5th Cir. 1988).  "[E]rrors are considered prejudicial when they cast doubt onto the existence of substantial evidence in support of the ALJ's decision."  *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988).  In the Fifth Circuit, harmless error exists when it is inconceivable that a different administrative conclusion would have been reached absent the error. *Bornette v. Barnhart*, 466 F. Supp. 2d 811 (E.D. Tex. Nov. 28, 2006) (citing *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003)).  Accordingly, to establish prejudice that warrants remand, Plaintiff must show that consideration of the unaddressed opinion evidence might have led to a different decision.  *See id*. at 816 (citing *Newton*, 209 F.3d at 458).

The Commissioner argues that any error was harmless because the ALJ considered the opinions of the SAMCs, which included considerations of Dr. Warren's report, Mr. Nichols' evaluation, and the vocational evaluation.  (doc. 19 at 17.)  The SAMCs only specifically referenced two of Plaintiff's MRIs, Mr. Nichols' functional capacity evaluation, and Plaintiff's September 19, 2013 examination conducted by Dr. Lash, however.  (*See* R. at 218-19, 240.)  The SAMCs do not appear to have relied on Dr. Warren's psychological testing or the vocational evaluation.  (*See id*.)

42

The results of Dr. Warren's testing and the vocational evaluation found Plaintiff's vocational limitations to include her significant impairment in attention-concentration for auditory stimuli, as well as depression and anxiety, and the vocational evaluation opined that these limitations could add to the challenge of performing a sedentary job. (R. at 425, 427, 501.) The vocational evaluation found that Plaintiff had difficulty performing repetitive hand motions and questionable hand tolerance because of carpal tunnel syndrome and neuropathy, and provided the only test of Plaintiff's fine finger dexterity, which was found to be well below average. (R. at 421, 425, 427.) This finding appears to conflict with the SAMCs' opinions that Plaintiff could operate hand controls and had no manipulative limitations, and with the ALJ's finding that Plaintiff had no manipulative or reaching limits. (R. at 218-19, 239-40, 267.) The evaluation further found that Plaintiff frequently needed to change positions, which could complicate many sedentary jobs. (R. 425.) Additionally the physical limitations determined from the vocational evaluation and Mr. Nichols' evaluation were greater than the RFC limitations imposed by the SAMCs and ALJ. (*See* R. at 218-19, 239-40, 266, 394, 425.)

Had the ALJ considered the opinions of Dr. Warren, Mr. Nichols, and those in the vocational evaluation, she could have found additional limitations regarding Plaintiff's ability to work due to her physical and mental conditions that would affect Plaintiff's RFC, and possibly her ultimate finding. The VE testified that if an individual were off task 10% of the time or more, or had absences of two or more days per month, it would be difficult to maintain competitive employment. (R. at 181.) The VE also testified that if an individual were limited to no more than occasional handling and fingering, the only job available would be as a system surveillance monitor, and also stated that frequent changing of positions could complicate many sedentary jobs. (R. at 183, 187.)

Therefore, consideration of the opinions of Dr. Warren, Mr. Nichols, and those contained in the vocational evaluation could have resulted in a finding that Plaintiff was precluded from all jobs identified by the ALJ, including her past relevant work.

Accordingly, the ALJ's error was not harmless because it is not inconceivable that she would have reached a different decision had she considered the opinion evidence discussed above.  *See McAnear v. Colvin*, No. 3:13–CV–4985, 2015 WL 1378728, at *5 (N.D. Tex. Mar. 26, 2015) (finding remand was required because there was a realistic possibility of a different conclusion by the ALJ where the court was unsure of whether the ALJ considered the medical source's opinion and whether such a review would have changed the outcome of his decision); *Singleton v. Astrue*, No. 3:11–CV–2332, 2013 WL 460066, at *6 (N.D. Tex. Feb. 7, 2013) (finding the ALJ's error in not considering the medical source opinion was not harmless and reversal and remand were required because the court could not say what the ALJ would have done had he considered the opinion, and had he considered the opinion he might have reached a different decision).[6]

## IV. RECOMMENDATION

Plaintiff's summary judgment motion should be **GRANTED IN PART**, the Commissioner's summary judgment motion should be **DENIED IN PART**, the Commissioner's decision should be **REVERSED IN PART**, and the case should be **REMANDED** for further proceedings.

**SO RECOMMENDED** on this 24th day of August, 2018.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

---

[6] Because this error requires remand, and the ALJ's consideration of the opinions of Dr. Warren, Mr. Nichols, and the opinions contained in the vocational evaluation may affect the remaining issues, it is unnecessary to reach them.

44

### INSTRUCTIONS FOR SERVICE AND
### <u>NOTICE OF RIGHT TO APPEAL/OBJECT</u>

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE